**IN UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**NORTHWESTERN DIVISION**

| | |
|---|---|
| Raaum Estates, a North Dakota General Partnership, effective January 1, 1989, by and through its Present Managing Partner, Joseph Dale Raaum a/k/a Dale Raaum  ) <br> ) <br> ) <br> ) <br> )  | **FINDINGS OF FACT,** <br> **CONCLUSIONS OF LAW,** |
| Plaintiff,  ) | **AND ORDER FOR JUDGMENT** |
| ) | |
| vs.  ) | |
| ) | |
| Murex Petroleum Corporation, a foreign business corporation, licensed to do business in North Dakota,  ) <br> ) <br> )  | Case No. 4:14-cv-024 |
| ) | |
| Defendant.  ) | |

---

## FINDINGS OF FACT[1]

### The parties and their interests

1.     Plaintiff Raaum Estates is a North Dakota partnership comprised of five family members: Joseph Dale Raaum ("Dale Raaum"); Katherine E. Raaum; Eileen LaVon Albertson; Lois Raaum; and Clarence Gnoinsky.   The Raaum Estates owns several tracts of farm and pasture land in the vicinity of Fortuna, North Dakota.  In addition to these tracts, some of the family-member partners have other tracts in the area that are owned separate from the partnership holdings. (Tr. 142-143, 165-170; Ex. P34).[2]

---

[1]  These are the court's principal findings of fact as required by Fed. R. Civ. P. 52(a)(1).  Additional findings of fact may appear in the conclusions of law or vice versa, particularly when considering mixed questions of law and fact.

[2]  "Tr." refers to the trial transcript at Doc Nos. 43 & 44.  The page references are to the page numbers at the bottom center of the page.

2.     Dale Raaum is the managing partner for the Raaum Estates.  He also owns his own land in the vicinity of the partnership land.   Raaum began farming in 1962 and had retired by the time of the events relevant to this action beginning in 2008.  His formal education ended after the ninth grade.  (Id.).  Raaum appeared at trial and gave testimony on behalf of the Raaum Estates.

3.     Murex Petroleum Corporation ("Murex")  is a closely-held oil and gas exploration and production company headquartered in Houston, Texas.   It operates in several states, including North Dakota.   By the time of trial, it was operating more than two hundred wells and had non-operating interests in several hundred more.  In addition, it was operating a handful of saltwater disposal wells.  (Tr. 9-12).  Nevertheless, in relation to major and medium-sized exploration and production companies, Murex is still a relatively small company.

The principal witnesses for Murex at trial were Don Kessel ("Kessel") and Dave Elder ("Elder").  Kessel was one of the co-founders of Murex and was its Vice-President and Chief Operating Officer during most of the time relevant to this action. Kessel graduated from North Dakota State University with a degree in petroleum engineering.  Although Kessel retired several months prior to trial, he still retains a significant ownership interest in the company.  (Tr. 9-11, 32).

Elder is Murex's Manger of Acquisitions and Divestitures.  He joined the company in 2011 as its land manager and held that position in 2013 when he attempted to negotiate a new agreement with the Raaum Estates as discussed in more detail later. Elder is a member of the American Association of Petroleum Landmen.  He has a petroleum land management degree from the University of Houston.  (Tr. 239-40, 311).

**The Gulf lease**

4.	Murex is the successor-in-interest to an oil and gas lease dated July 10, 1974, that was granted by Dale Raaum's mother, Hanna Raaum, to the Gulf Oil Corporation and ratified by other members of the Raaum family (the "Gulf Lease").  (Exs. P1 & P2).  The Gulf Lease covers the following tracts in Divide County:

> Township 162 North, Range 101 West
> Section 1:   SE¼
> Section 8:   SW¼
> Section 15  SW¼
> Section 17: W½, SE¼
> Section 20:  NE¼
> Section 21:  SE¼NE¼
> Section 22:  N½NW¼, SE¼NW¼, NW¼NE¼, N½SW¼, SW¼NW¼
>
> Township 161 North, Range 101 West
> Section 6:  NE¼SW¼, N½SE¼, SE¼NE¼

In pertinent part, the lease provides:

> * * * * That the said lessor, for an in consideration of Ten and more ($10.00+) Dollars cash in hand paid, receipt of which is hereby acknowledged and of the covenants and agreements hereinafter contained on the part of the lessee to be paid, kept and performed, has granted, demised, leased, and let and by these presents does grant, demise, lease, and let unto the said lessee, its successors and assigns, for the sole and only purposes of surveying by geological, geophysical and all other methods, mining and operating for oil, condensate, gas, asphalt, sulphur, and all other minerals and substances, whether similar or dissimilar, that may be produced from any well drilled by lessee on the leased premises hereinafter described, and laying pipelines and building tanks, power stations and structures thereon to produce, save and take care of said products * * * *
> 	It is agreed that this lease shall remain in force for a term of ten years from date, and as long thereafter as oil, condensate, gas, asphalt, sulphur, or other minerals or substances covered hereby, or either or any of them, is produced from said land by the lessee, its successors and assigns.

(Ex. P1).  The significance of this language will be addressed later.

As noted above, the Gulf lease covers tracts in eight different sections of land located in two different townships. During the time relevant to this action, the Raaum Estates owned the surface to a number, but not all, of the tracts subject to the Gulf Lease. (Exs. P1 & P35).

The references herein to "on-lease" or "off-lease" refer to whether certain wells or activities were located or took place on land covered by the Gulf Lease or off, including whether any saltwater generated from the activities is either "on-lease" or "off-lease" saltwater.

**Murex's development of a commercial saltwater disposal operation in 2009 using land within or adjacent to the State Raaum wellsite together with the Fortuna State well and increasing the capacity of that operation in 2013**

5.      The State Raaum 1-15 ("State Raaum") is a producing oil well located in the SW ¼ of Section 15, Township 162 North, Range 101 West. The State Raaum was drilled and completed in the early 1980's and Murex became its operator after it acquired its interest in the Gulf Lease. (Tr. 13-16). The State Raaum is an "on-lease" well.

The Raaum Estates is the fee surface owner of the SW¼ of Section 15. (Ex. P34). The dispute in this case arises out of Murex's use of land within or adjacent to the State Raaum wellsite beginning in mid-2009 for the offloading, storage, and pumping of saltwater over to the nearby Fortuna State SWD 16-1 ("Fortuna State") for underground disposal.

6.      The Fortuna State is located in the SE¼ of Section 16, Township 162 North, Range 101 West, just across the section line from State Raaum and a short distance to the northwest. (Ex. P30). The Fortuna State is located on land owned by the State of North Dakota that is not subject to the Gulf Lease. (Exs. P1, P12, P34). The Fortuna State was drilled in the early 1980's originally as a producing well.

At some point Murex acquired the Fortuna State.  In 2008, Murex decided to convert it to a saltwater disposal well, completing the conversion in July 2009.  According to Murex's application for approval for underground injection, the saltwater is to be disposed of in a formation located between 4,408 to 4,812 feet below the surface.  (Ex. P9).

A substantial reason for the conversion of the Fortuna State was to provide an outlet for the saltwater being generated by the State Raaum.  By piping the saltwater generated from the State Raaum a short distance over to the Fortuna State, Murex would not have to incur the costs of trucking the saltwater to a disposal well operated by a third party and then, on top of that, pay a third-party disposal fee.  (Tr. 19-32; 246-47).

7.  In order for Murex to inject saltwater into the subsurface at the Fortuna State, it needed a high pressure injection pump.  Also, if water trucked from other wells was going to be disposed of in the Fortuna State, there needed to be facilities for offloading the water and tanks for temporary storage.  Instead of locating the injection pump, tanks, and offloading equipment at the Fortuna State wellsite, which would usually be the case for a saltwater disposal well, Murex decided to place this equipment at the State Raaum site instead.  (Tr. 249-50, 280-83).  According to Murex, this was done for safety reasons because the sight lines for the intersection where trucks would otherwise be turning onto or from the access road to the Fortuna State were poor.  (Tr. 249).

8.  To get the State Raaum-Fortuna State saltwater disposal operation up and running, Murex, in mid 2009, installed the saltwater handling and pumping equipment at or adjacent to the State Raaum wellsite that included two water tanks,[3] a triplex injection pump, piping, and a small building erected on a poured slab to house the injection pump.  It also installed the pipeline that

---

[3]  There was already one tank on site that handled the saltwater generated by the State Raaum.

would transport the saltwater unloaded into the tanks at the State Raaum and then pumped under high pressure by the injection pump over to the Fortuna State for injection almost a mile underground. Murex did not install any separate unloading facilities or pumps at the Fortuna State. (Tr. 89-92, 280-84; Exs P29, D108, at pp. 0614-0637).

9.    As a result of an explosion of drilling in the Fortuna area by Murex and other companies that began in about 2012, Murex took steps to increase its capacity for saltwater disposal. Beginning in mid-2013, Murex: (1) upgraded its facilities at the State Raaum by installing two additional water storage tanks and replacing the old triplex pump with a larger one;  (2) brought online a new saltwater disposal well in Section 4, Township 162 North, Range 101 West (almost three miles north and slightly west of the Fortuna State) known as the Legaard SWD 1 ("Legaard."); and (3) obtained easements for, and eventually installed, a network of saltwater pipelines to connect new production wells generating saltwater for disposal either to the Legaard or the State Raaum, or both.[4] (Tr. 81- 88; 282-83; Ex. D108, pp. 0646-0662).

**Murex's use of the State Raaum-Fortuna State saltwater disposal operation to dispose of both "on-lease" and "off-lease" saltwater**

10.    Murex began disposing of saltwater generated by production from the State Raaum through the State Raaum-Fortuna State disposal system in July 2009.  Beginning as early as August 2009, Murex occasionally accepted for disposal some saltwater from third-party "off-lease" wells and then, beginning in 2011, from some Murex operated "off-lease" wells.  (Ex. P21).

---

[4] Included in the easements that Murex obtained, was an easement from the Raaum Estates across certain of its property as well as easements across other tracts owned by individual members of the Raaum family, including Dale Raaum.  While Murex's hope was to be able to dispose of saltwater from the wells serviced by the new network of pipelines at either the Legaard or the State Raaum, Murex has never used the new pipelines to dispose of "off-lease" saltwater through the State Raaum-Fortuna State disposal system because of the pendency of this action.  (Tr 82-89).

From July 2009 to about May 2012, the number of barrels of saltwater disposed of through the State Raaum-Fortuna State disposal system appears to have ranged generally between 1,500 and 5,500 barrels per month, with the amounts for a couple of the months being slightly lower or higher. During this time frame, most of the saltwater that was disposed of was generated by the State Raaum, generally between 900 barrels per month up to just under 4,000 barrels per month. (Id.).

Beginning in about May 2012, the amount of saltwater disposed of through the State Raaum - Fortuna State systems began to slowly rise, reaching to just under 20,000 barrels per month by mid-2013. Then, at that point, there was a huge increase in the amounts beginning in August 2013 with the following amounts being reported by Murex from August 2013 through January 2014:

| Month | Number of barrels |
|-------|-------------------|
| August 2013 | 91,584 |
| September 2013 | 95,931 |
| October 2013 | 113,390 |
| November 2013 | 105,317 |
| December 2013 | 82,644 |
| January 2014 | 70,055 |

Part of this increase was from third-party and Murex "off-lease" wells and part came from three new Murex "on-lease" wells completed in 2013. (Id.).

Most of the saltwater that was disposed of through the State Raaum-Fortuna State system was saltwater from the oil-bearing formations from which oil is produced, sometimes called "production" water. Some of the water that was disposed of, however, was freshwater that becomes contaminated when used in drilling and fracing operations, often referred to as "pit" or "flowback" water. Until 2013, most of the pit water disposed of at the State Raaum-Fortuna State system came from "off-lease" wells, including small amounts from the Fortuna State that would have been trucked over to the State Raaum and then disposed of through the system since there were no injection pumps at the

Fortuna State. (Tr. 38, Ex. P21). In 2013, when Murex drilled three new "on-lease" wells, some of the pit water generated during the completion of those wells was disposed of through the State Raaum-Fortuna State system in addition to production water after the wells became operational. (Ex. P21). For purposes of the remainder of the discussion, saltwater includes both production water and pit water.

**Agreements Murex relies upon for the right to use the SW¼ of Section 15 for the disposal of "off-lease" saltwater**

11.     As discussed in more detail later, while Murex had the right under the Gulf Lease to use the surface of the SW¼ of Section 15 where the State Raaum is located for "on-lease" oil drilling and recovery operations subject to certain conditions, it did not have the right under the Gulf Lease to use the SW¼ of Section 15 to support "off-lease" production, including the disposal of "off-lease" saltwater. Murex does not dispute this point but contends that it had the right under one or more of three other agreements to use the SW¼ of Section 15 to dispose of "off-lease" saltwater, including that generated by third parties.

12.     One of the agreements that Murex relies upon was an agreement that Murex's predecessor-in-interest obtained from the Raaum Estates' predecessor-in-interest in 1980 for the use of a tract in the SW¼ of Section 15 for purposes of drilling and operating the State Raaum. (Ex. D101). It is clear from the documents submitted by Murex that this agreement was entered into to satisfy the requirements of N.D.C.C. ch. 38-11.1, which requires that surface owners be compensated for land that is used by a production company for the subsequent production of oil and gas. As discussed later, this agreement (and the compensation paid for it) purports only to provide for the use of the surface in the SW¼ of Section 15 for drilling and oil recovery operations for the State

Raaum - not a saltwater disposal operation that includes the disposal of "off-lease" saltwater  (Id.).

13.    The other two agreements that Murex relies upon were secured in late 2008 before Murex completed the installation of the State Raaum-Fortuna State saltwater disposal system.  One of these agreements was a pipeline easement dated November 13, 2008.  In that agreement, the Raaum Estates granted Murex a right-of-way to construct and operate a pipeline across the quarter section where the State Raaum is located for the transportation of salt water, which reads, in pertinent part, as follows:

**RIGHT-OF-WAY GRANT**

**FOR AND IN CONSIDERATION OF** an aggregate sum equal to $12.00 per rod for each rod of pipeline constructed under the terms hereof, payable as hereafter set forth, Raaum Estates, c/o Dale Raaum, hereinafter referred to as Grantor(s), do hereby grant, warrant and convey unto: Murex Petroleum Corporation, its successors and assigns, hereinafter referred to as Grantee, the right to construct, maintain, inspect, operate, protect, repair, replace, change the size of, or remove a pipeline, any appurtenances useful and incident to the operation and protection thereof, for the transportation of salt water and any other like or unlike substance which may be moved by and through a pipeline along route to be selected by Grantee, on, over and through the following described lands, of which Grantor(s) warrant they are owners in fee simple, situated in the County of Divide, State of North Dakota, to-wit:

**Township 162N, Range 101W**
**Section 15: SW4SW4**

together with the right of unimpeded ingress and egress to and from said line or lines, or any of them, for the purpose foremost.  * * * *

Grantee has paid the sum of $756.00 and other consideration, upon the execution hereof, receipt of which hereby acknowledged.  * * * *

("2008 Pipeline Easement") (Ex. P3).

The second agreement was dated December 8, 2008, and gives Murex the right to use an access road in Section 15 for the purpose of hauling salt water.  That agreement reads in pertinent part:

ACCESS ROAD CONSENT

For and in consideration of the sum of Five Hundred Dollars ($500.00), plus an annual rental of $500.00 (should the road be used for salt water disposal purposes), the undersigned, Raaum Estates, c/o Dale Raaum, does hereby give Murex Petroleum Corporation consent to use and maintain the *access road* for salt water disposal purposes. The *mentioned road* is located upon or across Township 162N, Range 101W, Section 15, W2SW4, County of Divide, State of North Dakota.

This consent is to remain in force through the duration of all salt water disposal activity to and from State Raaum 1-15.

It is further agreed that, Murex Petroleum Corporation will compensate the undersigned for all damages occasioned to the above described lands as a result of its operation.

(italics added) ("Access Road Consent") (Ex. P4). While the Access Road Consent is not specific as to a particular road, it obviously pertains to the road that already provided access to the State Raaum wellsite. As discussed later, it does not purport to cover anything other than the access road to the State Raaum wellsite.

14. Murex paid the Raaum Estates for the 2008 Pipeline Easement and subsequently installed a pipeline running from the State Raaum to the Fortuna State. Murex also paid the Raaum Estates the initial $500 to secure the Access Road Consent. (Ex. P16). However, despite using the access road for hauling saltwater to the State Raaum site beginning in May 2009, Murex failed to pay the annual rental for the next five years. (Tr. 68).

**Dale Raaum's encounter with Kessel in the summer of 2013**

15. In the summer of 2013, Dale Raaum encountered Don Kessel (then the COO and part owner of Murex) on a roadway in the vicinity of the State Raaum when both of them happened to be in the area. The exact date of the encounter is uncertain but Raaum recalled it occurring in July and Kessel's testimony was not inconsistent with it occurring during that time frame. (Tr. 117, 160).

According to Raaum, he questioned Kessel about the substantial increase in the truck activity then occurring at the State Raaum and asserted the Raaum Estates should be entitled to some money for it. Raaum testified that Kessel promised he would look into it. (Tr. 147-48, 160).

Kessel agreed the conversation centered upon the substantial increase in truck activity and testified that he told Raaum that it may be fair to consider some additional compensation. (Tr. 117-118). While Kessel testified he believed Murex had the right to dispose all of the saltwater that was then being brought onto the Raaum Estate's property (including "off-lease" water generated by Murex operated wells and those of third parties), he did acknowledge that Murex had not contemplated the large increase in oil production in the area that occurred in 2012 and 2013, which, in turn, generated the need for disposal of much larger volumes of saltwater and with it a substantial increase in truck traffic. (Tr. 116). Kessel agreed he told Raaum he would have someone contact him.

Kessel testified he was not aware at the time of the conversation that Murex had failed to make the annual payments due under the Access Road Consent and that Dale Raaum never raised the issue during their conversation. (Tr. 117). The court finds that the subject never came up during that meeting.

**Elder's negotiations with Dale Raaum**

16. After the meeting between Dale Raaum and Kessel, Dave Elder (then the land manager for Murex) called Raaum to address the concerns he had raised with Kessel. There ensued several discussions over a couple of days about Murex paying the Raaum Estates a per-barrel amount for at least some of the saltwater being disposed of the through the State Raaum-Fortuna State disposal system. Both Raaum and Kessel agreed during their respective testimonies that there

was some back and forth with respect to the per-barrel amount and what saltwater would be covered. There are some differences in recollection, however, with respect to the details.

Elder testified that he was charged by Kessel with finding out what the Raaum Estates wanted for the disposal of third-party saltwater.[5] According to Elder, when he called Dale Raaum, Raaum wanted to know what Murex was paying the State, which was $.10 per barrel, and that was what Raaum suggested would be an appropriate amount. Elder testified he told Raaum that was too much given that the saltwater was not being disposed of on the Raaum Estates property but maybe half of that amount might be a possible. Elder testified that Raaum suggested that might work and that he (Elder) stated he would have to discuss it further with Murex's management. (Tr. 284-86).

Elder testified that he presented the $.05 figure to Kessel but Kessel told him it was too much in view of what was already being paid to the State. Elder stated that Kessel told him it would actually be in the Raaum Estate's best interest to agree to a lower amount because, if $.05 was added to the $.10 already being paid the State, Murex would likely dispose of more of the saltwater at the Legaard (its new saltwater disposal well) where it was only paying $.065 per barrel. (Tr. 286).

Elder testified he then went back to Dale Raaum and offered $.02 per barrel but that Dale Raaum wanted $.05. Elder testified he then discussed the possibility of $.035 and understood Dale Raaum to have indicated that might work if the Raaum Estates got paid that amount for all of the

---

[5] Neither Kessel nor Raaum testified that their discussion focused on the source of the saltwater. Given that, the court finds somewhat curious the direction from Kessel to Elder that he ask how much the Raaum Estates wanted for the disposal of third-party saltwater as opposed to saltwater generated from the other sources. A fair inference may be that, following the meeting between Kessel and Raaum, Kessel went back and examined the arrangements that Murex had in place with the Raaum Estates and that he (and maybe Elder as well) concluded Murex was vulnerable under the existing arrangements (which did not include a saltwater disposal agreement of the type that Murex later offered) since one reading of at least the Access Road Consent is that it would be limited to the hauling of Murex's own saltwater.

saltwater that had already been trucked into the State Raaum site for disposal through the State Raaum-Fortuna State system. (Tr. 288).

Dale Raaum's recollection was somewhat different. He testified he initially suggested $.09 per barrel, which he characterized as being just under what the State was charging. He also acknowledged that, at some point, Murex came up to $.035. While acknowledging that he was willing to think about that amount if Murex paid that going forward as well as retroactively, he testified he had to take that offer back to the rest of his family members and that, when he did, they collectively decided that $.035 was insufficient. (Tr. 171-72, 182). Also, while Raaum's testimony was not entirely clear, the evidence suggests that the $.035 per barrel he was willing to consider would have to be paid on all of the barrels of saltwater, including those generated by the State Raaum. (Tr. 174).

Raaum also testified that Murex initially also stated it would also make a $3,000 back payment on the road right-of-way. (Tr. 170). The court finds this testimony to be credible, which, in turn, suggests that, after the meeting between Kessel and Raaum, someone from Murex had gone back to examine the agreements it had in place with the Raaum Estates and discovered it was delinquent in its payments under the Access Road Consent.

Murex claims in this action that a binding agreement was reached with respect to the $.035 as a result of this conversations between Raaum and Elder. The court finds and concludes that this was not the case, even without consideration of any problems under North Dakota's statute-of-frauds, see N.D.C.C. § 9-06-04(1)&(3). First, Murex's claim of a binding agreement is belied by Elder's own testimony, the clear import of which was that he had to go back and get approval for the $0.35 amount from his management. Second, just as Elder had to go back and get approval from his

management, the court finds to be credible Dale Raaum's testimony that he needed to get approval from his family and because of that he did not and could not commit to any price on their behalf during his conversations with Elder. (Tr. 176, 178). Third, there does not appear to have been an agreement as to what saltwater the per-barrel amounts being discussed would apply to. As discussed in a moment, Elder forwarded a proposed agreement to Raaum that would have applied the $.035 to all saltwater except that originating from the State Raaum and there is credible evidence that Raaum believed the amount should cover *all* saltwater if there was going to be a negotiated deal. (Tr. 174). Fourth, there were additional details to be worked out. As discussed next, the proposed agreement that Elder forwarded to the Raaum Estates after these tentative discussions included several terms and conditions that had not been explicitly discussed between Raaum and Elder.

### Murex's offer of a saltwater disposal agreement

17.     On October 16, 2013, Elder forwarded to Raaum a document entitled "Salt Water Disposal and Surface Use Agreement." (Ex. P6). The proposed agreement stated:

> Specifically, Owner grants exclusively to Murex the right to utilize the location as a Saltwater Disposal Facility and install water tanks, oil tanks, pipelines and all other required facilities and equipment to inject water into the Fortuna State 16-1 SWD.

The proposed agreement went on to provide that Murex would pay $.035 for all "offsite water" disposed of and that this would be retroactive to November 9, 2009. The latter made clear that, while the $.035 would not apply to saltwater generated by the State Raaum, it would cover other saltwater disposed of through the facilities.[6]  (Id.).

---

[6] When Elder forwarded the proposed saltwater disposal agreement, the Raaum Estates had not yet consulted with an attorney and there is no evidence that, up to that point, there had been any discussions about the particulars of the existing agreements in the conversations between Raaum with Kessel and then Elder. That being the case, and if it was so clear that the existing arrangements were sufficient as Kessel and Elder claimed during their testimony, why a completely new agreement rather than simply amending the Access Road Consent? One possible inference is that Murex on its own became concerned about the adequacy of the existing agreements to cover what was taking place.

The agreement that Elder forwarded also included terms that were not discussed during his conversations with Dale Raaum. In particular, there was included a provision that would allow Murex to use up to three acres of land for the saltwater disposal facilities. This would have allowed Murex to more than double the size of the area then being used by Murex of approximately 1.76 acres, given that a portion of the acreage was devoted strictly for oil recovery operations and not the handling of the saltwater.[7] (Id.; Ex. P29).

### The Raaum Estate's rejection of Murex's proposed agreement and the commencement of this action

18.     The Raaum Estates never accepted the proposed agreement. Dale Raaum and his family-member partners ultimately concluded that the per-barrel amount should be higher than the $.035 that Murex had offered. Also, they were not in agreement with the provision that would allow Murex to use up to 3 acres of the property for saltwater disposal activity when the present activity was confined to an area less than half that size. (Tr. 171-72, 182). The Raaum Estates then, for the first time, consulted with an attorney. Thereafter, there was some dialogue between Murex and the Raaum Estate's attorney. From the Raaum Estates' perspective that dialogue broke down when, amongst other things, Murex did not respond to a November 2013 request for an accounting of past disposals of saltwater. (Tr. 388-89; Ex. P20). The Raaum Estates then commenced this action in late January 2014 in state court and Murex removed it to this court in late February 2014.

---

[7] In addition, there were several inaccuracies in the proposed agreement that were pointed out later after the Raaum Estates consulted with an attorney. First, the legal description was incorrect. It stated that the disposal facilities were located in the NE¼SW¼ of Section 15 when, in fact, the exiting facilities were located in the SW¼SW¼ of Section 15. Also, despite the discussion about Murex paying for some or all of the past saltwater disposed of, the proposed agreement went back to only November 2009 even though saltwater, including "off-lease" saltwater, had been disposed of earlier than that. Finally, the proposed agreement had the wrong name for the Raaum Estates. (Tr. 383-90; Ex. P6).

**Actions taken by Murex following the commencement of this action**

19.     After the commencement of this action, Murex forwarded a check to Dale Raaum on behalf of the Raaum Estates tendering the five years worth of missed annual payments that had become due under the Access Road Agreement and not paid.  (Ex. P7 & P8).  The Raaum Estates refused to negotiate the check, taking the position that the Access Road Consent had terminated as a result of Murex's substantial breaches of the agreement.  (Ex. P20).

20.     Also after being sued, Murex halted use of the State Raaum-Fortuna State disposal system for disposal of "off-lease" saltwater from both Murex operated and third-party wells.  It did continue, however, to use the facilities to dispose of  "on-lease" water, principally that generated by the State Raaum.  (Tr. 342-45).

21.     Dale Raaum testified without any objection being made that, after the commencement of this action, Murex offered to increase its prior offer of $.035 to $.05 per barrel, which, presumably was for all of the saltwater, except "on-site" saltwater generated by the State Raaum, both past and future.  (Tr. 172).  In February 2014, the Raaum Estate's attorney wrote Murex requesting that any further communication with the Raaum Estates be made through her.  The letter referenced the $.05 per barrel offer that had been made and rejected.  (Ex. P20).  Murex did not dispute this evidence and the court finds that the $.05 offer was made and rejected.

**Additional facts**

22.     The total number of barrels of saltwater disposed of through the State Raaum- Fortuna State system from July 2009 through January 2014 based on "transported" volumes reported by Murex to the North Dakota Industrial Commission ("NDIC") in its "Form 16's" were as follows:

| "On-lease" water | Barrels | Totals |
|---|---|---|
| State Raaum | 128,887 | |
| Murex's new 2013 "on-lease" wells | 175,359 | |
| Total "on-lease" | | 304,246 |
| | | |
| "Off-lease" water | | |
| Murex "off-lease" (from appx. 19 wells) | 441,625 | |
| Third-party "off-lease" | 142,741 | |
| Total "off-lease" | | 584,366 |
| Total all saltwater | | 888,612 |

Murex claims slightly less numbers from the Form 16's relying upon monthly amounts injected based on meter readings. For example, Murex claims that the total amount of "off-lease" saltwater disposed of was 578,557 barrels. (Tr. 28; Exs. P21, D116). The court finds and concludes that the more appropriate number for purposes of the court's evaluation of damages is 584,366 barrels since several of Murex' Form 16's reference questions about the meter readings and meter discrepancies. (Ex. P21).

23. While the record does not reflect the range in size of all of the trucks used to haul saltwater onto the Raaum Estate's property in the SW¼ of Section 15 for disposal, the invoices from one trucking company introduced as exhibits showed that the highest amount hauled in one load was just under 200 barrels and the lowest 90 barrels with most of the hauls being in the 120 to 166 barrel range. (Ex. P33, P38). In August 2013 when just over 95,000 barrels of saltwater were disposed of through the State Raaum-Fortuna State system, 55,678 barrels was "off-lease" saltwater. (Ex. P21). Assuming an average of 140 barrels per truck, that would have amounted to just under 400 separate truck loads of "off-lease" saltwater in August 2013 alone.

24. As noted above, Murex did not confine its operation of the State Raaum-Fortuna saltwater disposal system to just the disposal of "on-site" saltwater from the State Raaum or even just "on-lease" saltwater. Rather, Murex used the State Raaum's property in the SW¼ of Section

15 as part of a commercial venture to dispose of saltwater from third parties as well saltwater from "off-lease" wells for which it was the operator on behalf of itself and others having an interest in the oil being recovered from the wells. The amount that Murex charged for the disposal of saltwater through the State Raaum-Fortuna State salt water disposal system through October 2011, was $.55 per barrel for production water and $1.50 per barrel for pit water. Beginning November 2011, these rates increased to $0.75 for production water and $1.75 for pit water. (Tr. 33-38).

The amount of revenue that Murex generated from the disposal of all "off-lease" saltwater from July 2009 through January 2014 was $554,081. (Tr. 354-56, 394 & Ex. 21). There is no dispute between the parties as to this number.[8]

25.     Murex claims that it and those sharing in the costs and expenses of the State-Raaum-Fortuna State disposal system have lost money. Hence, according to Murex, there is no basis for awarding damages based on a theory of unjust enrichment.

As evidence of its claimed loss, Murex added all of the capital costs for the State Raaum-Fortuna State disposal system of $1,584,995.02 (Tr. 3240; Ex. 26A) to the operating expenses allocated to the "off-lease" saltwater of $307,000 (Tr. 306; Ex.P27) and then subtracted the revenue generated from the "off-lease" saltwater of $554,081, resulting in a claimed deficit of approximately $1.3 million.

The court is not persuaded by this analysis. The principal reasons are (1) the inclusion of all the capital costs (most probably none should be considered in this particular situation but certainly not all) and (2) the fact that Murex did not factor in all of the benefits it obtained.

---

[8] The parties did not introduce evidence of a separate revenue amount for just the third-party saltwater although a rough estimate could be made by taking the total "off-lease" revenue times the percentage of third-party "off-lease" saltwater to the total of all of the "off lease" saltwater.

One fundamental problem with using the capital costs is that, if Murex made poor decisions or spent too much, its benefit from the marginal net revenue from the disposal of the "off-lease" saltwater would have reduced any loss. Further, the court is skeptical that there will be any loss over time, even assuming the disposal of the saltwater needs to be a separate profit center for Murex to realize overall economic benefit. The reason is that Murex did not factor in what it would have cost to truck the State Raaum saltwater to a remote disposal site and then pay what likely may have been a higher disposal fee over and above the trucking expense. Further, the benefit of those saved costs will continue in the future so long as the State Raaum continues to produce oil. Also, in addition to the State Raaum generated saltwater, the evidence is clear that Murex enjoyed some costs savings in being able to dispose of saltwater from its other wells, both "off-lease" and "on-lease," through the State Raaum-Fortuna State disposal system instead of paying what likely would be more expense to truck it elsewhere as well as potentially higher disposal fees than it was charging back to itself and the persons and entities sharing in the operating costs of the wells. (Tr. 357-58, 405-06). These savings also were not considered.

Finally, the saltwater must be disposed of in some fashion in order for Murex to able to produce oil and generate revenue from its oil production. In other words, even if Murex could not turn the disposal operation itself into a profit center, it likely benefitted by having a reliable outlet for the saltwater that its operations generated. In part indicative of this was Kessel's response to Murex's attorney's question as to why Murex's rates for commercial disposal of saltwater at the State Raaum-Fortuna State system were less than another commercial operator in the area. Kessel testified: "In all honesty, we probably just didn't update our pricing because we want to maximize our revenue as a corporation." (Tr. 112).

For all of the reasons, the court finds that Murex has not presented sufficient evidence for its consideration of the capital costs in the event damages were to be awarded based on an amount Murex was enriched by the disposal of "off-lease" saltwater. Further, even if some consideration of capital costs would be warranted, Murex failed to establish an appropriate amount. In fact, Murex made no attempt to amortize whatever capital costs might legitimately be considered and limit those being claimed to what would be attributable to the time period under consideration.

26.     In part based on the foregoing, the court finds that Murex did obtain an economic benefit from the disposal of the "off-lease" saltwater through the State Raaum-Fortuna State disposal system. At the very least, this was the delta between the revenue generated from the disposal of that saltwater less an allocation of expenses attributable to that water. Using Murex's own numbers, this was $247,081.00 for the time period in question, May 2009 through January 2014. And, that is likely understated in terms of actual benefit, even when considering only these numbers, given Kessel's acknowledgment it may have kept its disposal rates artificially low for other purposes.

Further, the court also believes that Murex was also enriched by an amount that it saved from being able to dispose of the "off-lease" saltwater through the State Raaum-Fortuna State system rather than trucking it. How much, however, is less certain. The Raaum Estates has offered a "back-of-the-envelope" calculation of avoided additional trucking costs of $264,975.00. While the court believes there is a possibility of an amount of saved trucking expense in this range or greater, the Raaum Estates has failed to prove an amount with sufficient certainty for it to be the basis of an award of damages.[9]

---

[9]  A calculation sufficient to sustain an award of damages would have required taking into consideration the actual distances between the many wells in question to the State Raaum versus other disposal sites as well as evidence of the relevant trucking rates.

27.    The court finds that Murex's conduct in using the Raaum Estates' property for the disposal of "off-lease" saltwater was intentional, *i.e.*, it was not inadvertent.

28.    The court also finds, however, that Murex did not attempt to use the Raaum Estates' property for its saltwater disposal operation without making any attempt to secure the right to do so. Rather, before making any entry for that purpose, it secured the 2008 Pipeline Agreement and the Access Road Consent. While the court concludes that Murex did not have the right to use the Raaum Estates' property for the disposal of "off-lease" saltwater, the matter is complicated and there is no evidence that Murex's mistaken judgment that it had the right to do so was the product of bad faith.

For these reasons, the court finds that Murex was not a "conscious" trespasser as that term is used later in the conclusions of law set forth below, at least up to the point when it focused upon the fact that it had failed to pay the annual rentals due under the Access Road Consent. Even then, for the short period of time that it continued to use the Raaum Estates property for the disposal of the "off-lease" saltwater thereafter, Murex's reasonably believed it was going to be able to reach a new agreement with the Raaum Estates that would have taken care of its delinquency. Then, when it was clear a new agreement could not be reached, Murex immediately tendered the amount owed and suspended its use of the Raaum Estates property for the disposal of "off-lease" saltwater pending the resolution of the case.

Finally, for all of these same reasons, the court finds that Murex did not act with oppression, fraud, or actual malice as required for an award of punitive damages.

## CONCLUSIONS OF LAW

**The claims**

29.     The Raaum Estates asserts claims for trespass, private nuisance, intentional fraud, negligent misrepresentation, fraud, conversion, and unjust enrichment.

The claim of conversion fails because there is no evidence that personal property has been converted. <u>Ritter, Laber & Associates, Inc. v. Koch Oil, Inc.</u>, 2004 ND 117, ¶ 11, 680 N.W.2d 634 ("Conversion consists of a tortious detention or destruction of personal property, or a wrongful exercise of dominion or control over the property inconsistent with or in defiance of the rights of the owner."); <u>see also</u> 18 Am. Jur. 2d <u>Conversion</u> § 15 (May 2017 update) ("An action for conversion generally lies only with respect to personal property; real estate is not subject to conversion.").

The claims of fraud (intentional or otherwise) and negligent misrepresentation fail for lack proof. Finally, any claim for private nuisance (if there is one) is subsumed by the claim for trespass given the particular circumstances of this case. <u>Cf.</u> <u>Highland Fifth-Orange Partners, LLC v. Inland Fish and Game Conservation, Ass'n</u>, Nos. E049388 & E050205, 2011 WL 3964084, at *4 n.3 (Cal. Ct. App. 4th Dist. Sept. 9, 2011) (unpublished) (treating the trespass and nuisance claims as the same). Further, even if there was a basis for separately considering a private nuisance claim, the Raaum Estates has failed to prove damages that would be recoverable on such a claim different from what the court is otherwise awarding.

For these reasons, the only claims that will be addressed are those for trespass and unjust enrichment. And, with respect to these claims, while not conceding that Murex had the right to use the SW¼ of Section 15 for anything other than the disposal of saltwater generated by the State

Raaum, the Raaum Estates seeks relief only for Murex's unauthorized use of the property for the disposal of "off-lease" saltwater.

### The agreements that Murex relies upon for the right to dispose of "off-lease" saltwater

#### *The Gulf Lease*

30.     Murex concedes in its post-trial brief  that it does not have the right under the Gulf Lease to use the Raaum Estate's property for the disposal of "off-lease" saltwater absent some agreement that provides it with that right.  But, even if that is not the case, the court concludes this is the governing principle. Krenz v. XTO Energy, 2017 ND 19, ¶ 42, 890 N.W.2d 222 ("Krenz") ("[A] lessee generally cannot, in the absence of contractual permission, use the surface of one lease to benefit mining operations on adjacent land."); see also Mosser v. Denbury Resources, Inc., 112 F.3d 906, 918 (D.N.D. 2015) ("Mosser"); Hill v. Southwestern Energy Co., No. 4:12–cv–500, 2013 WL 5423847, at * 3–4 (E.D. Ark. Sept. 26, 2013) (lease did not grant right to use the property for storage of frack waste fluid from any possible source); Dick Properties, LLC v. Paul H. Bowman Trust, 221 P.3d 618, 621 (Kan. Ct. App. 2010) (lessee's implied covenant to dispose of salt water is limited to salt water produced on the lease).  This is to be distinguished, however, from any right under the Gulf Lease to install saltwater disposal equipment on the SW¼ of Section 15 for the disposal of "on-lease" saltwater.

#### *The 2008 Pipeline Easement and the Access Road Consent*

31.     Murex relies upon several agreements that it claims collectively, if not individually, gave it the right to dispose of "off-lease" salt water using the Raaum Estate's property  in the SW1/4 of Section 15.  The two agreements it primarily relies upon are the ones it secured from the Raaum

Estates in 2008 prior to the installation and operation of the State Raaum-Fortuna State saltwater disposal operation.

The first of these two agreement is the 2008 Pipeline Easement that it acquired on November 13, 2008, as set forth earlier. While that agreement allowed Murex to install a pipeline that would transport saltwater, there is nothing in it that specifically authorizes the installation of the facilities at or adjacent to the State Raaum wellsite for the unloading, handling, storage, and then pumping of the saltwater at high enough pressure to be able to able to inject it down a well at the other end of the pipeline. Murex contends that these facilities are "appurtenances" within the meaning of the easement. The court disagrees. The injection pump, the building that houses it, the four storage tanks, the equipment required to unload the saltwater, and the area for truck unloading together occupy more than a trivial amount of above ground space and the facility generates substantial truck traffic. Further, unlike valves, inspection ports, compressors, etc., these facilities are not required for operation of the pipeline itself. In short, a person granting the pipeline easement would not reasonably expect that "appurtenances" would encompass what amounts to a commercial facility for the unloading, handling, storage and pumping[10] of saltwater.

In its post-trial brief, Murex cites to two cases that it claims supports its "appurtenances argument." The cases, however, are inapposite in that the facilities at issue in those cases were clearly within the scope of the easements. See Bernier v. Columbia Gas Transmission Corp., No.3:05cv00011, 2005 WL 2621989, at *5 (W.D. Va. Oct. 12, 2005) (an above ground gas valve

_____

[10] The triplex pump located at the State Raaum does more than simply pump the saltwater over to the Fortuna State. Rather, it is a pump that is designed to inject the saltwater deep into the earth for disposal. But for its location at the State Raaum wellsite, an injection pump would have been needed at the Fortuna State for the injection of the saltwater that would be transported by truck or pipeline from the State Raaum to the Fortuna State.

structure was an appurtenance within the scope of the easement given that there was no dispute it was reasonably needed for operation of the gas line); Minnkota Power Co-op, Inc. v. Lake Shure Properties, 295 N.W.2d 122 (N.D. 1980) (an easement granting the right to install an electric transmission line encompassed the right to upgrade the size of the line from 220-kv to 345-kv absent language in the easement restricting the size of the line that could be installed).[11]

32.     Murex also contends that the Access Road Consent that was granted on December 2, 2008 provides it with the requisite authority to install the unloading, storage, and pumping facilities. Again, the court disagrees. All that the plain language of the Access Road Consent authorizes is use of the existing "access road" for saltwater disposal purposes. There is nothing within the four corners of the document that suggests it encompasses the site where the saltwater is unloaded, stored, and pumped for injection over to the Fortuna State.

33.     In other words, even assuming that (1) "saltwater" referenced in the 2008 Pipeline Easement and the Access Road Consent is all saltwater no matter what its source, as opposed to State Raaum generated saltwater only, "on-lease" saltwater only, or Murex generated saltwater only, and (2) the Raaum Estates did not have the right to treat the Access Road Agreement as having terminated due to Murex's substantial and material defaults - a point addressed later, there is a gap in the rights that Murex acquired in terms being able to use the Raaum Estates property in the SW¼ of Section 15 for the operation of a commercial saltwater disposal facility - at least for purposes of handling "off-lease" saltwater

---

[11]  If the issue was whether Murex could install a new pipeline of greater capacity, that likely would fall within the scope of the 2008 Pipeline Easement for the reasons articulated in Minnkota Power. In this case, the facilities that Murex installed at or adjacent to the State Raaum wellsite are more analogous in the context of Minnkota Power to an electrical substation, putting aside for the moment the amount of truck traffic generated by the commercial saltwater disposal facilities. The court doubts the North Dakota Supreme Court would hold that an electrical substation would be within the scope of an easement for a power line absent specific language allowing for such a facility.

34.     Murex urges that, despite any literal deficiencies in the two 2008 agreements, the obvious intent of the parties when looking at both the 2008 Pipeline Easement and the Access Road Consent was to authorize the use of the entirety of the property for its commercial saltwater disposal operation.  The court declines to go down that path for the principal reason that neither of the two agreements are ambiguous with respect to the fact that they do not encompass or authorize the saltwater unloading, storage, and pumping facilities or the use of the site upon which they are located. Given the lack of ambiguity, North Dakota law does not permit the court to go beyond the language of the agreements to divine what the parties may have intended.  See, e.g., Krenz, 2017 ND 16, ¶ 12; Riedlinger v. Steam Brothers, Inc., 2013 ND 14, ¶¶ 14-15, 826 N.W.2d 340 (citing statutory requirements).

35.     Even if the court was to stray beyond the four corners of the 2008 Pipeline Easement and the Access Road Consent, the court is not convinced that what Murex relies upon actually supports what it claims was the *mutual* intention of the parties as opposed to, perhaps, Murex's unilateral intention.   In particular, the court is not convinced from the evidence presented that the Raaum Estates understood at the time the 2008 agreements were entered into (which was prior to any facilities being installed) that Murex was going to do anything more than dispose of saltwater generated by the State Raaum by piping it over to the Fortuna State for disposal rather than trucking it out.

More particularly, it is not at all clear that the Raaum Estates understood *when the agreements were entered into* that: (1) facilities beyond those required to pump State Raaum saltwater over to the Fortuna State would be installed; and (2) that these facilities would be used to dispose of saltwater from other wells - much less saltwater from a large number of Murex-operated

"off-lease" wells and, even less, saltwater from third-parties, who are not mentioned in either agreement. In reaching this conclusion, the court finds to be credible Dale Raaum's testimony that he understood that Murex would be pumping State Raaum saltwater over to the Fortuna State by pipeline but did not understand that the injection pump and tanks were going to be placed in the area of the State Raaum pumping site, much less that Murex was going to be using the property for the handling of other saltwater. (Tr. 154-59). With respect to the latter, Dale Raaum testified: "Well, I thought they were going to move our saltwater out of there [from the State Raaum], but not everybody else." (Tr. 158). He also testified that, during this time period, he did not go down to the area where the facilities were installed very much and had spent considerable time in the hospital. (Tr. 154-56).

In attempting to persuade the court that the intent of the 2008 Pipeline Easement and the Access Road Consent was that they would authorize the installation and operation of a commercial saltwater disposal operation, Murex presented no evidence of what the actual discussions were between the parties prior to the consummation of the agreements. Rather, it relies primarily upon what it claims the parties must have been intended based upon what Murex's existing rights were and certain post-agreement conduct that the court finds not to be not very persuasive in terms of what the Raaum Estates may have intended at the time it executed the agreements.[12]

---

[12] Murex also presented testimony from both Kessel and Elder as to what they believed the effect of the 2008 agreements to be. However, Elder was not with the company in 2008 when these agreements were negotiated and Kessel acknowledged he was not involved in their negotiation. (Tr. 73, 311). While Kessel's and Elder's belief as to what the agreements may have authorized may be relevant with respect to the issue of punitive damages, the court would give their testimony little weight with respect to the actual meaning of the agreements. See, e.g., Sickler v. Lone Tree Energy & Associates, LLC, No. 4:12-cv-077, 2014 WL 1334185 (D.N.D. Apr. 2, 2014) (after-the-fact, self-serving testimony by a party as to what an agreement meant entitled to little or no weight under North Dakota law in construing an agreement deemed to be ambiguous).

In terms of the former, Murex contends that the Raaum Estates must have intended that the Access Road Consent allowed for the disposal of all saltwater, including third-party saltwater, since Murex had the right to truck saltwater out of the State Raaum wellsite under the Gulf Lease and had, in fact, been doing that for years.  The problem with this, however, is that it assumes a level of legal knowledge that the court is unwilling to impute in this instance to Dale Raaum, a layperson with only a ninth grade education.  For all a layperson might know, the Access Road Consent merely affirmed or guaranteed that the access road could still be used for disposal of saltwater from the State Raaum after the pipeline became operative in case it or the Fortuna State were out of commission and the saltwater had to be trucked out to a different disposal site.[13]

Murex also points to certain answers that Dale Raaum gave in response to its attorney's questioning about his awareness of some trucks hauling water into the State Raaum wellsite *after* Murex had installed the initial facilities for the State Raaum-Fortuna State disposal system.   (Tr. 158-59).  Murex argues that Raaum's answers reflect (1) that he had to have understood this was "off-lease" saltwater because Murex did not have any "on-lease" wells at the time other than the State Raaum and, (2) that his failure to then object reflects what must have been his understanding in 2008 when the agreements were entered into.  The court's view of that brief testimony, however, is that it was not as clear with respect to what his understanding was at the time he saw the trucks, as Murex contends.  That is, it is not at all clear that, when he saw the trucks, he necessarily consciously focused upon the fact that they must have been carrying "off-lease" saltwater.  Finally,

---

[13]   In fact, the most probative post-agreement conduct may be Murex's in terms of its offer to pay for third-party saltwater and later its proposed saltwater disposal agreement.  See notes 5 & 6 *supra* and accompanying text.

even if Raaum understood that the water in the trucks he observed back in 2009 contained "off-lease" water, there is no evidence that he understood it was from third parties.[14]

While Murex contends that the court should look beyond the literal language of the 2008 Pipeline Easement and Access Road Consent to conclude that the two agreements authorize what amounts to a commercial saltwater operation, it urges the court at the same time to construe "saltwater" as used in the two agreements to mean saltwater from any possible source since neither agreement expressly provides otherwise. In other words, Murex only wants the court to divine the intent of the parties when required to support its position and ignore the likelihood of there being a latent ambiguity with respect to what saltwater was *mutually* intended. See Goodall v. Monson, 2017 ND 92, ¶ 9, 893 N.W.2d 774 (discussing latent ambiguity).

Finally, Murex has not even persuaded the court as to what it claims its intention was with respect to the 2008 Pipeline Easement or the Access Road Consent at the time it secured these agreements. As already noted, Murex did not introduce evidence from those who negotiated the agreements on its behalf. The court finds it equally, if not more, plausible that Murex believed that the 2008 Pipeline Easement covered the pipeline and the Access Road Consent covered the access road and that it mistakenly assumed it had the right to use the area adjacent to or within the State

---

[14] It is not clear whether Murex is also relying upon the same conduct to more broadly argue that the Raaum Estates either waived its right to seek damages for the wrongful use of its property for the disposal of "off-lease" saltwater or is somehow estopped from seeking that relief. However, if it is, the court finds and concludes for the same reasons that the evidence is too vague and equivocal to support waiver. That is, the evidence falls short of proving there was a voluntary and intentional relinquishment of a claim for damages. Cf., Pfeifle v. Tanabe, 2000 ND 219, ¶ 18, 620 N.W.2d 167; Livingood v. Meece, 477 N.W.2d 183, 187 (N.D. 1991); Schilling v. Carl Tp., Grant County, 235 N.W. 126, 130 (N.D. 1931). With respect to any claim for estoppel, the evidence falls short of meeting the necessary elements, including, particularly, evidence supporting a sufficiency of knowledge that would support a duty to speak out, much less evidence that Murex, rightfully or otherwise, relied upon any failure to speak out to its detriment. See Blume Const., Inc. v. State ex rel. Job Service of North Dakota, 2015 ND. 285, ¶ 32, 872 N.W.2d 312 (elements of estoppel); 75 Am. Jur. 2d Trespass § 67 (May 2017 update) (discussing the application of the doctrine in the context of claims for trespass).

Raaum wellsite to install and operate the saltwater unloading facilities, the storage tanks, the injection pump and pumphouse, and the area needed for unloading of the trucks under either (1) the Gulf Lease, (2) the fact that it was already using the wellsite for other purposes (*i.e.*, "no harm no foul"), and/or (3) the 1980 agreement that will be discussed in a moment.

In summary, the 2008 Pipeline Easement and the Access Road Consent are not on their face ambiguous with respect to the fact that they do not by their terms authorize the installation of the unloading equipment, the storage tanks, the injection pump and pump house, and the area for the unloading of the trucks necessary to operate the State Raaum-Fortuna State saltwater disposal system. In order for Murex to be able to use the SW¼ of Section 15 to dispose of "off-lease" saltwater, it must look elsewhere. Consequently, the court need not further consider what appears to be the strong likelihood of a latent ambiguity with respect to the term "saltwater" as used in the two agreements.

### The 1980 agreement

36.     The last agreement that Murex relies upon for the right to install the referenced saltwater handling and disposal equipment on the SW¼ of Section 15 apart from the pipeline and access road is a 1980 agreement that was obtained by the oil production company that drilled the State Raaum well. As required by North Dakota's Surface Owner Protection Act codified at N.D.C.C. ch. 38-11.1, the production company that was seeking to drill the State Raaum paid the Raaum Estates' predecessor-in-interest an amount to compensate it for damages that would result from the use of enough of the property in the SW¼ of Section 15 to drill the State Raaum and later operate it if it became a producing well. In making that payment, the production company obtained an agreement from the Raaum Estates's predecessor-in-interest for use of the property for that

purpose, most probably to memorialize the satisfaction of the requirements of ch. 38-11.1. (Ex. D101).

Neither the payment for the State Raaum wellsite (including access to it) pursuant to ch. 38-11.1 in 1980, nor the agreement secured at that time vested Murex's predecessor or later Murex with right to use the property in SW¼ of 15 (whether within the area originally cleared for the drilling of the State Raaum or adjacent thereto) for the installation and operation of saltwater disposal facilities that included unloading equipment, storage tanks, pump and pumphouse that would be used to commercially dispose of saltwater generated by offsite wells. This is because ch. 38-11.1 is not a source of any rights to use the property; rather, it simply requires payment for the exercise of rights already held. Further, there is nothing in the text of the 1980 agreement that purports to allow the property to be used for that purpose. Rather, it only authorizes the use of the surface in the SW¼ of Section 15 for drilling and oil recovery operations and access to the wellsite for those purposes. And, while that might include disposal of saltwater generated at the wellsite, it certainly did not authorize the use of the surface for a commercial saltwater disposal system, particularly one that would dispose of "off-lease" and third-party saltwater, which could continue long after oil recovery at the State Raaum might cease. In fact, the 1980 agreement provides that, after initial drilling operations are completed, the wellsite was to be shrunk in size to only that needed for oil recovery operations and the remaining land unused for that purpose reclaimed. (Ex. D101).[15]

---

[15] As this court has construed ch. 38-11.1, the surface owner is entitled to compensation not only for the land directly used, which in this case was for a wellsite first to drill the well and later a site reduced in size for oil recovery, but also for any diminishment in value to adjacent acreage that may be "affected" by that particular use. In Deadwood Canyon Ranch LLP v. Fidelity Exploration and Production Company, No. 4:10–cv–00081, Chief Judge Hovland allowed the surface owner to present evidence of the diminishment in value to the entirety of plaintiff's property (a ranch that plaintiff claimed it was in the process of developing into a commercial hunting and recreational preserve) and not just the acreage actually occupied by the production company for the drilling and oil recovery operations of the oil wells that were the subject of the statutory claim for damages pursuant to N.D.C.C. § 38-11.1-04. The result in that case was a

In short, simply because Murex's predecessor-in-interest made a payment for a wellsite for use for oil drilling and recovery operations and secured an agreement to confirm its right to use the property for that limited purpose did not vest it, or now Murex, with the right to use the property for a different purpose, including here the right to use the property for a commercial saltwater disposal operation that included the disposal of "off-lease" saltwater.

### *Summary re the agreements Murex relies upon*

37.     In summary, the court concludes that neither the 2008 Pipeline Easement, the Access Road Consent, nor the 1980 agreement obtained by Murex's predecessor-in-interest accorded it the right to install and operate the facilities required for its commercial saltwater operation, other than, perhaps, the pipeline and the access road and even those may be limited if there is a latent ambiguity with respect to what was meant by "saltwater" - a point that the court need not resolve for reasons already stated.   And, while Murex may have had the right to install and operate some or all of the facilities for the disposal of "on-lease" saltwater under the Gulf Lease, subject to the constraints of North Dakota's accommodation doctrine and its compliance with the statutory obligations of ch 38-

---

$1,000,000 jury verdict. Id. at Doc. No. 149.

In this case, the facilities installed by Murex in the SW¼ of Section 15 for the saltwater disposal system do occupy acreage that is not required for the oil recovery operations at the State Raaum, albeit a small amount.  This is evident from Ex. P29.  Also, the impact of all of the increased truck traffic could result in some diminishment in value to the surrounding acreage that is different from or over-and-above that caused by the oil recovery operations.  Further, the potential time period for which the additional acreage  being  used and the affected surrounding acreage impacted may very well be different with the potential for the saltwater disposal operation to continue after the State Raaum ceases production.

The Raaum Estates did not make any claim at trial for compensation pursuant to ch. 38-11.1, and likely for good reason in that the incremental damage may have been small and the time period for giving notice of a claim under that chapter may have expired before the Raaum Estates consulted with counsel.  That does not mean, however, that the Raaum Estates forfeited any right to sue for any unauthorized use of the property since, as already noted, ch. 38-11.1 is not a source of rights to be on the property in the first instance.  Second, § 38-11.1-10 expressly makes clear that the right to recover damages under that chapter is not in lieu of the right to seek recovery for violation of other rights.

11.1,[16] Murex did not have the right to subject the Raaum Estates' surface estate to the increased burdens of the disposal of "off-lease" saltwater under the Gulf Lease. Finally, all of this is assuming the Access Road Consent did not at any point terminate on account of Murex's repeated failure to make the annual payments due under it.

### Murex's breach of the Access Road Consent and whether it justified termination

38.     Under North Dakota law, a material breach of an agreement can give rise to the right of the non-breaching party to treat the agreement as having terminated. See Riedlinger v. Steam Brothers, Inc., 826 N.W.2d 340, 349 (N.D. 2013) ("A party breaches a contract when the party fails to perform a contractual duty when due. [citation omitted]. This Court has generally recognized the material breach of a contract by one party gives the non-breaching party a right to terminate the contract."). Undoubtedly, Murex's failure to make any annual payment over a period of five years was a substantial and material breach since that was the only compensation contemplated by the agreement for use of the access road for the disposal of saltwater.

Murex contends, however, that not every breach of an agreement will justify termination, citing to VND, LLC v. Leevers Foods, Inc., 2003 ND 198, 672 N.W.2d 445 where the North Dakota Supreme Court stated: "Whether a contract should be canceled for breach depends upon the facts of each case." Id. at ¶ 32. Murex argues that the facts of this case do not justify termination. In the alternative, Murex contends that the Raaum Estates' failure to complain about the lack of payment while being aware that deliveries of saltwater were being made to the disposal facilities amounted

---

[16] See, e.g., Mosser, 112 F.3d at 913-14, 918-19 (discussing the accommodation doctrine as well as the obligations of mineral developers to pay surface owners for loss of use of the property and other damages under ch. 38-11.1).

to a waiver of the defaults - at least to the extent of being able to rely upon them as grounds for terminating the agreement.

Given the court's conclusion that Murex did not have the right to use the area where it installed its saltwater disposal facilities on the SW¼ of Section 15 for the purpose of disposing of "off-lease" saltwater, even if the Access Road Consent remained in effect, the court need not decide whether the repeated failure to make the annual payment justified termination, and, if so, when that termination may have become effective.[17]

---

[17] Murex argues that the North Dakota Supreme Court would hold that the decision of whether or not a contract can be terminated is to be made based upon the consideration of the factors set forth in the Restatement (Second) of Contracts § 241 (1981), which provides:

In determining whether a failure to render or to offer performance is material, the following circumstances are significant:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Murex suggests in its post-trial brief that, when applying these factors, it is clear that termination would not be justified because the Raaum Estates would have been made whole under the Access Road Consent had it accepted the tender of the past due amounts made by Murex (but only after commencement of this action) while, on the other hand, Murex would suffer a $1.9 million forfeiture if the agreement was terminated based on what it claims it spent on the State Raaum-Fortuna State disposal system.

Even assuming the foregoing are some or all of the factors that should be considered, the court does not believe that Murex would suffer a financial loss anywhere close to the magnitude it claims. First of all, there is the benefit that Murex has already enjoyed from its investment in the facilities as discussed earlier and the fact that it will still be able to use the existing facilities to dispose of State Raaum generated saltwater going forward, if not also Murex "on-lease" saltwater that could be transported to the State Raaum by the pipeline installed in 2013. Second, the largest cost that Murex incurred in putting in place the State Raaum-Fortuna State disposal system was the cost of rehabilitation and re-entry of the Fortuna State to a depth where the disposal of saltwater could be made, which was approximately $1.5 million. (Tr. 247). Murex has made no showing that it could not employ other alternatives to continue to realize upon that investment for the disposal of saltwater without using the SW¼ of Section 15. For example, just because the area of the State Raaum provided a better access and exit point for handling trucks does not mean that it would not be possible to use the Fortuna State site for that purpose with some modifications or the creation of an alternative access point. Further, Murex has now installed a saltwater pipeline that runs right by the property (Ex. P34) and there appears to be no reason why it could not run that pipeline over to the Fortuna State site and dispose of saltwater there after moving whatever facilities are otherwise required to the Fortuna State or installing additional ones there. Finally, the court is

**Murex's unauthorized use of the SW¼ of Section 15 for the disposal of "off-lease" saltwater amounting to continuous acts of civil trespass**

39.     Under North Dakota law:

> [¶ 15]   Civil trespass is a common law tort in North Dakota and is not statutorily defined. This Court has defined trespass as "an 'intentional harm,' " where a person "intentionally and without a consensual or other privilege ... enters land in possession of another or any part thereof or causes a thing or third person so to do." McDermott v. Sway, 78 N.D. 521, 529–30, 50 N.W.2d 235, 240 (1951). A person who commits a trespass "is liable as a trespasser to the other irrespective of whether harm is thereby caused to any of his legally protected interests." Id. at 530, 50 N.W.2d at 240. If there is no intent or "affirmative voluntary act" by the alleged wrongdoer, there cannot be a claim for trespass. Id.

Tibert v. Siominski, 2005 ND 34, ¶ 15, 692 N.W.2d 133 (2005).  To satisfy the scienter requirement

for civil trespass, the aggrieved party need only prove an intent to commit the act that results in the

trespass.  It is not necessary that the trespasser knew that his or her conduct would amount to a

trespass.  Also, it does not make a difference that the trespasser was acting under a mistaken belief

regarding the right to enter and use the property or was otherwise acting in good faith.  Finally, it

does not make a difference that the trespasser did not intend to cause harm to the property or even

that any harm resulted.  See id.; Sagebrush Resources, LLC v. Peterson, 2014 ND 3, ¶ 20, 841

N.W.2d 705, see generally 75 Am. Jur. 2d Trespass §§ 5-7, 26 (May 2017 update); Restatement

(Second) of Torts §§ 158, 163-64 (1965).

---

not convinced that the North Dakota Supreme Court would conclude that the mere fact that Murex might suffer some adverse financial consequences greater than the $3,000 that was owed the Raaum Estates (plus interest which Murex never offered despite not having paid for five years) would necessarily save it from the consequences of termination on account of such a fundamental and long-continuing  breach.

　　　In an earlier order denying the parties' cross-motions for summary judgment, the court concluded that the Access Road Consent never became effective because of a total failure of consideration based on what the court understood the facts to be at the time, which included that, in addition to the five years of unpaid annual installments, Murex had also not paid the initial $500 to secure the agreement.  The partied discovered later that the initial $500 had been paid.

As set forth in the court's findings, Murex's use of the Raaum Estates' property in the SW¼ of Section 15 for the disposal of "off-lease" saltwater was intentional, *i.e.*, it was not inadvertent or not unintended. That being the case, it amounted to civil trespass since, as already explained, its use of the property for that purpose went beyond its rights under the Gulf Lease. And, to the extent that the North Dakota Supreme Court has not already addressed the issue, the court concludes it would hold, as number of other courts have held, that the use of property in excess of rights granted under an easement or license amounts to a trespass. See, e.g., Barfield v. Sho-Me Power Elec. Coop., 852 F.3d 795, 803 (8th Cir. 2017) ("Barfield") (an easement holder lawfully on the servient land commits a trespass to the extent its use of the property exceeds the scope of the easement under Missouri law); Gerrity Oil & Gas Corp. v. Magness, 946 P.2d 913, 927-28 (Colo. 1997) (*en banc*) (mineral developer that exceeded its implied rights to reasonable use of the surface for the development of minerals is subject to a claim of trespass); Raven Red Ash Coal Co. v. Ball, 39 S.E.2d 231, 233 (Va. 1946) ("Raven Red Ash Coal Co.") (every use of an easement for a purpose that is not necessarily included in the grant of the easement is a trespass); see generally Restatement (Second) of Torts § 214(2) (1965) ("One who properly enters land in the exercise of any privilege to do so, and thereafter commits an act which is tortious, is subject to liability only for such tortious act, and does not become liable for his original lawful entry, or for his lawful acts on the land prior to the tortious conduct."); cf. Sagebrush Resources, 2014 ND 3, ¶ 20 (characterizing the rights of mineral lessee to use of the surface for the development of oil and gas as an easement).

**Injunctive relief**

40.     An injunction is an appropriate remedy in cases of continuing trespass or other violation of possessory rights. See, e.g., Viestenz v. Arthur Tp., 54 N.W.2d 572, 579-80 (1952);

Farmers Union Oil Co. of Epping v. Kilgore, 299 N.W. 318, 321 (1947); cf. Sagebrush Resources, 2014 ND 3, ¶¶ 22- 24.  In this case, Murex continued to use the SW¼ of Section 15 for the disposal of "off-lease" saltwater until this action was commenced, at which point Murex halted the activity given the pendency of this action.  However, because Murex has claimed that its conduct was lawful and has not categorically stated it would not use the property in the future for the disposal of "off-lease" saltwater,  an injunction against further use of the property for that purpose is appropriate.

### Award of damages and prejudgment interest

#### *Introduction*

41.     In addition to an injunction, the Raaum Estates seeks a recovery for the past trespasses based upon the equitable principles of unjust enrichment, contending that North Dakota law would permit such a recovery - particularly if the only alternative would be an award at law limited to nominal damages.

Murex disagrees.  It takes the position that North Dakota law does not permit an award based on unjust enrichment since, according to it, the Raaum Estates has an adequate remedy at law for the tort of civil trespass - even if the award  is limited to nominal damages.  Murex further contends that the reason the Raaum Estates is limited to nominal damages is because it cannot point to any specific physical damage or diminution in value to its property as result of the claimed trespasses.

For the reasons articulated below, the court concludes the Raaum Estates would be entitled to a recovery based on restitutionary principles if the only damages that would otherwise be recoverable were nominal damages.  The court further concludes, however, that the Raaum Estates is not limited "at law" to a recovery of only nominal damages.  While there appears to be no North Dakota case directly on point with respect to claims for civil trespass, N.D.C.C. § 32-03-21 arguably

applies and does provide a measure of damages that results in a recovery of more than nominal damages in this case. Finally, if that is correct, the remaining question is whether the Raaum Estates can elect a recovery based on the principles of unjust enrichment if it is more favorable than what is provided for by N.D.C.C. § 32-03-21. For reasons that will become clear from what follows, the court need not decide that point although the North Dakota case law to date suggests that the answer is probably not.

Because there is some uncertainty with respect to these conclusions and also for ease of discussion, the court will begin with the Raaum Estates' request for a recovery based upon unjust enrichment and follow that by a discussion of a recovery based on the measure of damages set forth in § 32-03-21.

### *Damages if principles of restitution apply*

42. In some states, recovery based on principles of restitution, including unjust enrichment, is not permitted when the person aggrieved has a tort remedy, including a claim for intentional trespass. See, e.g., Boudreaux v. Jefferson Island Storage & Hub, LLC, 255 F.3d 271, 275-76 (5th Cir. 2001) (applying Louisiana law); Corsello v. Verizon of New York, 967 N.E.2d 1177, 1185 (N.Y. 2012) ("An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort remedy."); cf. Barfield, 852 F.3d at 804-05 (concluding that a landowner does not have a claim for unjust enrichment under Missouri law for the unauthorized use of property by an entity possessing the power of condemnation and that any damages are limited to what is recoverable under a common law suit for trespass or, alternatively, for inverse condemnation).

In other states, however, recovery based on principles of restitution and unjust enrichment is allowed for claims of trespass, at least in some cases. See, e.g., Beck v. Northern Natural Gas Co., 170 F.3d 1018, 1022-1023 (10th Cir. 1999) (sustaining an award based on a claim of unjust enrichment under Kansas law for an unauthorized subsurface storage of natural gas); Hill v. Southwestern Energy Co., No. 4:12-cv-500, 2013 WL 5423847, at *4 (E.D. Ark. Sept. 26, 2013) (applying Arkansas law and citing the Restatement (Third) Restitution); Harris Group, Inc. v. Robinson, 209 P.3d 1188, 1205-06 (Colo. Ct. App. 2009) (concluding that unjust enrichment is not always barred by the availability of a tort remedy at law, unlike what usually is the case when there is a legal remedy for breach of contract, because of the differences between the two types of claims); Cassinos v. Union Oil Co., 18 Cal. Rptr. 2d 574, 584-585 (Cal. Ct. App. 2d Dist. 1993) (plaintiff entitled to elect a recovery based on unjust enrichment); Raven Red Ash Coal Co., 39 S.E.2d at 234-39 (allowing a recovery based upon restitution principles when the legal remedy of nominal damages was deemed inadequate); Edwards v. Lee's Adm'r, 96 S.W.2d 1028, 1030-33 (Ky. Ct. App. 1936) (plaintiff permitted to recover under principles of restitution a portion of defendant's profits for the unauthorized use of that part of a cave operated by defendant as a tourist attraction that extended under plaintiff's property); see generally Restatement (Third) of Restitution and Unjust Enrichment § 40 (2011) ("Restatement (Third) of Restitution") (concluding that recovery based upon principles of restitution and unjust enrichment is appropriate in tort cases when justified by the circumstances). In some of these cases, it appears the courts viewed unjust enrichment as an alternative remedy for a claim of trespass and that the most favorable one could be elected. In others, there is the suggestion that unjust enrichment is only available if the remedy at law is inadequate. See id.

In the court's earlier order denying the cross-motions for summary judgment, the court noted there may be some uncertainty as to which of the two or three camps North Dakota falls in and declined to decide the point since it was not necessary then to do so. Raaum Estates v. Murex Petroleum Corp., No. 4:14–cv–024, 2015 WL 5692151, at ** 8-10 (D.N.D. Sept. 28, 2015). The court now concludes, however, that the North Dakota Supreme Court would decide that a damage remedy based on principles of restitution is available for a claim of civil trespass if the only other damage remedy available is an award of nominal damages.

As noted in the court's prior discussion of the issue, the North Dakota Supreme Court has on several occasions expressed, at least in *dicta*, that recovery based on unjust enrichment would be permissible if it was better suited than a recovery based on application of common law tort damages. (Id.). Further, as noted by the court's discussion, this *dicta* has its roots in the North Dakota Supreme Court's decision in Graven v. Bachus, 163 N.W.2d 320 (N.D. 1968), where it held that an equitable remedy of payment of money was more appropriate than the mandatory injunction that was otherwise required by law for a trespass caused by an encroaching wall. That case arguably decided the point and has never been overruled.

But, even if there remains some doubt, the court is convinced the North Dakota Supreme Court would find persuasive the position taken by the American Law Institute that a recovery based on restitution principles is appropriate in cases of trespass, conversion, and other like invasions of similarly protected interests, at least in some cases. Restatement (Third) of Restitution and Unjust Enrichment § 40 (2011). As the Colorado Court of Appeals has noted, there are fundamental differences between claims for breach of contract, for which it is clear that restitutionary-based relief is generally not an appropriate, and claims seeking recovery for tortious conduct and that the reasons

for not permitting such relief in the former do not necessarily apply in the latter. Harris Group, Inc., 209 P.3d at1205-06. And here, the North Dakota Supreme Court is likely to find persuasive the reasoning of other courts which have held that recovery based on restitution principles should be allowed in cases for civil trespass when the aggrieved party would otherwise be limited to nominal damages because nominal damages do not provide adequate compensation (particularly in cases of continuing trespass) and do little to deter future similar conduct. See, e.g., Raven Red Ash Coal Co., 39 S.E.2d at 233-39 (expressing these reasons for permitting an award based on restitutionary principles in a case that is fairly analogous to this one and that is also the basis for the Restatement (Third) of Restitution § 40, *illustration no. 2*).[18]

43.     The Raaum Estates argues that this court should award an amount that deprives Murex of the benefit it obtained by wrongfully having used its property for the disposal of "off-lease" saltwater. The Raaum Estates argues that the number is $760,620 and arrives at that amount as follows: It begins with the gross revenue that Murex generated on the disposal of the "off-lease" saltwater of $554,081. It adds to that an estimate of what it claims was additional saved trucking expense of $264,975. Then, after arguing that most of Murex's evidence as to what its costs were

---

[18] In Raven Red Ash Coal Co., the defendant was operating an overhead tramway for hauling coal which had been installed pursuant to an easement that allowed the right to haul coal across plaintiff's property that had been mined from certain specified tracts. The defendant used the tramway over a five year period to transport not only 950,000 tons of coal mined from the specified tracts but also 49,016 tons of coal mined from lands not specified in the easement. 39 S.E.2d at 233. The Virginia Supreme Court concluded that the unauthorized use of the plaintiff's property for the transportation of the 49,016 tons of coal amounted to a civil trespass because the use of the property for that purpose exceeded defendant's easement rights. Id. at 233-35. The court then upheld a damage award based on application of principles of restitution of $.01 per ton for the 49,016 tons that had been transported without authorization. Id. at 239. In allowing the verdict to stand, the Virginia Supreme Court noted the difficulty of determining damages at law and rejected the argument that the plaintiff should be limited to nominal damages. The court stated:

> To limit plaintiff to the recovery of nominal damages for the repeated trespasses will enable defendant, as trespasser, to obtain a more favorable position than a party contracting for the same right. Natural justice plainly requires the law to imply a promise to pay a fair value of the benefits received.

Id. at 238.

to generate the income and saved trucking expense is too unreliable to be used as an offset, it subtracts what it considers to be the only costs established by the record evidence of $58,436, which is the $.10 per barrel that Murex had to pay the State for the disposal of "off-lease" saltwater down the Fortuna State.

The court disagrees with this analysis. First, the court concludes that, if an award is to be made based on the amount Murex gained, it should be entitled to offset a proportion of its total operating expenses instead of just the amount it paid to the State of North Dakota for the disposal of the saltwater. Further, as noted in the court's findings, the Raaum Estates has failed to prove with sufficient certainty the saved trucking expense. Consequently, the most that the court would possibly consider, if it concluded it was equitable to require Murex to disgorge its gain, is $247,081. This amount is the difference between the revenue generated from the disposal of "off-lease" saltwater during the time period in question and the expenses the court has determined are attributable to the disposal of that saltwater.[19]

The court concludes, however, that an award of this magnitude would be excessive under the circumstances for two reasons. The first has to do with the degree of blameworthiness of Murex's conduct. According to the <u>Restatement (Third) of Restitution</u> §40, the cases support drawing a distinction between "conscious" trespassers and those whose conduct is less culpable. In particular, *comment b* reads as follows:

> *b. Measure of recovery*. When restitution by the rule of this section takes the form of a money judgment, the measure of recovery often depends on the blameworthiness of the defendant's conduct. Consistent with general principle, a conscious wrongdoer will be

---

[19] Even as to this amount, there is the question of whether it can all be fairly attributed to the use of the Raaum Estate's property given that the "off-lease" saltwater was ultimately disposed of on the State's property underlying the Fortuna State.

stripped of gains from unauthorized interference with another's property (§§ 3, 51(4)); while the restitutionary liability of a defendant without fault will not exceed the value obtained in the transaction for which liability is imposed. In consequence, a conscious wrongdoer may be liable to disgorge more than the value of what was taken or obtained in the first instance. By contrast, innocent trespassers and converters are liable in restitution for the value of what they have acquired—usually measured by the cost of a license—but not for consequential gains (§§ 51(2), 53(3)). Even this lesser liability will at times exceed any quantifiable injury to the property owner. Restitution is justified in such cases because the advantage acquired by the defendant is one that should properly have been the subject of negotiation and payment.

Given the factual setting of most claims within the rule of § 40—particularly those involving trespass to real property—the problem of measuring liability in restitution only rarely involves (as it does in Illustration 4) the identification of consequential gains in the form of an accounting for profits. The usual difficulty lies, rather, in assigning a value to the benefit acquired by the defendant as an initial matter.

Thus while a defendant's interference with real property sometimes involves a physical taking of material susceptible of market valuation, its more common form is that the defendant has made a valuable use of the defendant's property without paying for it. To the extent that the defendant's unjust enrichment may be identified with ordinary rental value, the owner's entitlement to restitution is captured in the claim to damages for "use and occupation." Restitution in cases such as Illustration 3 offers a further example of unjust enrichment measured by saved expenditure.

Unjust enrichment is more difficult to measure if the defendant has intentionally bypassed an existing market—consciously taking without asking, or proceeding in the face of the owner's refusal. Enrichment resulting from intentional trespass is not properly measured by ordinary rental value. A conscious wrongdoer will not be left on a parity with a person who—pursuing the same objectives—respects the legally protected rights of the property owner. If liability in restitution were limited to the price that would have been paid in a voluntary exchange, the calculating wrongdoer would have no incentive to bargain.

Nevertheless, courts are sometimes visibly reluctant to measure the unjust enrichment of a conscious trespasser by the full cost of making alternative arrangements, or by the full extent of consequential gains that an intentional trespass may have facilitated. Even against a conscious wrongdoer, restitution may be limited to avoid a liability for gains that are unduly remote (§ 51(5)(a)) or disproportionate to the loss on which liability is based (§ 58(3)(c)). See Illustrations 2, 4, and 6, and § 53, Illustration 11.

In this case, the court concludes that Murex was not a "conscious" trespasser within the meaning of the *comment b*. This is because Murex "did not consciously take without asking" or proceed "in the face of the owner's refusal." In fact, Murex obtained the 2008 Pipeline Easement and the Access Road Consent before proceeding. And, while the court has concluded that these two

43

agreements and the 1980 agreement discussed above were not enough, the applicable legal principles are difficult and there is no evidence that Murex purposefully attempted to ignore the Raaum Estates' rights. As noted by *comment b*, courts have found that disgorgement of the gain to be inappropriate for trespassers who have not acted with a conscious disregard of the property owner's rights.

The second reason the court concludes that disgorgement of the $247,081 is not an appropriate remedy is that it is disproportionate to the harm suffered. In this case, Murex probably could have installed and operated most, if not all, of the facilities it did install for the disposal of "on-lease" saltwater. Further, while the additional truck activity from the "off-lease" saltwater was significant, it was incremental. Under North Dakota law, damages are limited in all instances by statute to what is reasonable. N.D.C.C. § 32-03-37. Also, as noted by *comment b*, some courts have refused to require a disgorgement of the gain when it is disproportionate to the harm suffered. <u>See also</u> <u>Young v. Ethyl Corp.</u>, 581 F.2d 715, 719 (8th Cir. 1978) (applying Arkansas law and concluding in a case for the unauthorized withdrawal of brine from the subsurface below plaintiff's property that an award of a proportionate share of the profits generated from the processing of brine recovered from a large field that included plaintiff's property was grossly excessive and remanding for determination of an award of damages based upon either the market value of the brine recovered after deducting out all costs or the royalty rate being paid other landowners in the field).

44.    *Comment b* to § 40 of the <u>Restatement (Third) of Restitution</u> suggests that "innocent" trespassers and converters can held be liable for what it would have cost to have avoided the trespass. According to the Restatement, this normally (but not always) would be the rental value of the property or the cost to obtain a license. <u>See</u> <u>id.</u>

In this case, Murex agreed in 2013 to pay the surface owner for the Legaard disposal well, which was located several miles from the State Raaum, $.065 per barrel and back in about 2009 agreed to pay the State $.10 per barrel at the Fortuna State. Also, Elder testified that he conducted a "survey" of what other disposal operators were paying and that, while a number of them did not want to disclose the amount, one company stated it was paying $.05 and $.07 per barrel and another company reported it was paying $.08 and $.09. No other details were provided with respect to those transactions, however. For all the court knows, the $.05 and $.07 per barrel amounts were on old agreements. Also, it appears that the amounts Elder testified to were for all saltwater that was being disposed of and not just some of the saltwater.

Murex suggests that, if the court concludes that a trespass has occurred and relief based on the principles of restitution is appropriate, the court limit any award to an amount that is significantly less than what it or other operators of saltwater disposal facilities are paying surface owners. This is because, according to Murex, what it and other operators are primarily paying for is the use of the underground pore space as a disposal site for the saltwater and that, in this instance, this is taking place on the State's land underlying the Fortuna State and not on the Raaum Estate's property. In view of this, Murex suggests the $.035 per barrel it offered the Raaum Estates would be more than fair.

The court, however, is not persuaded by Murex's argument that the fact no saltwater is being disposed of below the Raaum Estates' property justifies in this particular case only a significantly smaller per-barrel amount in comparison to what it and others are paying surface owners for several reasons.

First, the court is not convinced that what is primarily being paid for in all cases is the right to use the subsurface pore space. From a surface owner's perspective, there are both surface and subsurface impacts resulting from the use of the surface estate for a commercial saltwater disposal operation. In terms of the subsurface, the mere occupancy by the saltwater of the interstitial pore space of a formation deep below the surface of the earth (where there likely is already some saltwater) is unlikely to cause any noticeable impact[20] - at least so far in North Dakota absent a breakdown of the equipment.[21] As a practical matter, what the surface owners are losing is the ability to use the pore space for themselves (probably unlikely) or selling its storage capacity to others (which may be a thin market). More noticeable and having a more direct impact is the surface activity and structures required to inject the saltwater in terms of the unloading facilities, storage tanks, pumps and pumphouses, as well the nuisance of the truck activity unless all of the saltwater is brought in by pipeline. Consequently, depending on the particular circumstances, what may be important and of value for one surface owner may not be for another. That is, for some the loss of use of the pore space may be the most important while for others it may be the surface impacts.

---

[20] In fact, courts in some jurisdictions have refused to award damages for trespasses involving saltwater invading pore space deep below the earth absent some proof of demonstrable damage. See Chance v. BP Chemicals Inc., 670 N.E.2d 985, 993 (Ohio 1996) ("[T]he trial court was correct in requiring appellants to prove some physical damages or interference with use proximately caused by the deepwells as part of their trespass claim in the circumstances of this case, thus placing on appellants the burden of establishing that the injectate interfered with the reasonable and foreseeable use of their properties."); Raymond v. Union Texas Petroleum Corp., 697 F. Supp. 270, 274-75 (E.D. La. 1988); West Edmond Salt Water Disposal Ass'n v. Rosecrans, 1950 OK 196, 204 Okla. 9, 226 P.2d 965 (Okla. 1950). The North Dakota Supreme Court has not yet ruled on these issues. However, there is presently before the North Dakota Supreme Court in Mosser v. Denbury Res., Inc., Doc. No. 20160379, certified questions from this court that include whether the surface owner owns and has the right to control the use of the pore space deep below the surface and whether and upon what basis a mineral developer may have to pay compensation to a surface owner pursuant to N.D.C.C. ch. 38-11.1 for use of the pore space for saltwater disposal. See also Mosser v. Denbury Res. Inc., No. 1:13-cv-148, 2016 U.S. Dist. LEXIS 160376 (D.N.D. November 18, 2016) (certification order).

[21] In several other states and countries, there is evidence that the underground disposal of waste water, or similarly the storage of gas under pressure, has caused earthquakes.

Second, for many of the same reasons, the court is not convinced that, when you separate the unloading, storage, and pumping facilities from the well location where the disposal is to take place, what would have to be paid at a market rate for two locations would necessarily add up to what would need to be paid for it to all occur at single location. More likely a premium would have to be paid to do what Murex has done.

Third, it appears the amounts that Murex offered into evidence as to what it and other operators are paying to other surface owners is for all of the barrels of saltwater that are being disposed of. If a surface owner is going to be compensated for only some of the saltwater, the surface owner is more likely to demand a higher per-barrel amount than what would be the case if all of it was being compensated.[22]

45. If the court was to make an award of damages based on restitution for Murex's past trespasses, the amount would be $40,906. The court reaches this amount after concluding that $.07 per barrel is an approximate estimate of what it would have cost Murex to obtain a license for the use of the SW¼ of Section 15 for the disposal of the 578,557 barrels of "off-lease" saltwater based on the record evidence. This per-barrel amount is in the range of what Murex and others were paying at other facilities for the disposal of *all* saltwater and here Murex would be paying only for

_____

[22] As noted earlier, *comment b* to § 40 of the Restatement (Third) of Restitution suggests that the cost to obtain a license or rent the property used without authorization would be the more appropriate measure of damages when the trespass is "innocent" as opposed to when there is a "conscious" decision to trespass. In this case, while Murex was not a "conscious" trespasser, it was not entirely an "innocent" one either given its repeated failure over a five year period to make the annual payments under the Access Road Consent, which is a critical linchpin of its argument that it had the right to use the Raaum Estates' property in the SW¼ of Section 15 for the disposal of "off-lease" saltwater. Given that, an award above market rate could probably be justified if it was otherwise equitable under the circumstances - at least so long as it would not be greater than the amount of benefit enjoyed by Murex for its unauthorized use of the Raaum Estate's property. See Restatement (Third) of Restitution § 40, *comment b*.

the "off-lease" saltwater.[23]  And, while this rate might imperfectly reflect the market for this unique

situation, Murex bears the responsibility for that.

### *Damages for civil trespass as measured by N.D.C.C. § 32-03-21*

46.     N.D.C.C. § 32-03-20  provides that the measure of damages for tort generally is the

"amount which will compensate for all the detriment proximately caused thereby, whether it could

have been anticipated or not."  Following § 32-03-20  are several other sections that provide more

specific measures of damages in particular situations, some of which involve tortious conduct, some

not, and some that arguably apply regardless of the nature of the action.  The next statute, N.D.C.C.

§ 32-03-21, provides the measure of damages for the wrongful occupation of realty.  That section

reads as follows:

> **§ 32-03-21. Damages for wrongful occupation of realty.**  The detriment caused by the
> wrongful occupation of real property in cases not embraced in sections 32-03-22, 32-03-27,
> 32-03-28, and 32-03-29 is deemed to be the value of the use of the property for the time of
> such occupation, not exceeding six years next preceding the commencement of the action
> or proceeding to enforce the right to damages and the costs, if any, of recovering the
> possession.

In this case, since Murex's use of the SW¼ of Section 15 for the unauthorized handling of

"off-lease" saltwater involves a wrongful occupation of the property for that purpose, the court

concludes that the North Dakota Supreme Court would hold that  N.D.C.C. § 32-03-21 applies and

would provide an "at law" measure of damages in this case.  The court reaches this conclusion based

upon the plain text of the statute as well as the North Dakota Supreme Court's decision in Belakjon

v. Hilstad, 35 N.W.2d 637 (1949).  In that case, the court held that § 32-03-21 is not confined in its

---

[23]  By comparison, the $40,906 is roughly half of what the amount would be if $.09 per barrel was paid on all
of the saltwater disposed of during the time period in question, which calculates out to be $79,975.

48

application to instances where there is a pre-existing landlord-tenant relationship and stated, more particularly, the following:

> The plaintiff contends that despite this statute, recovery for the value of use and occupation of real estate is allowed only where the relationship of landlord and tenant exists. This was the rule at common law and is now the rule in some jurisdictions, but it does not prevail in the presence of statutes such as the one above quoted. We find statutes identical with ours in California, Oklahoma and South Dakota. Under those statutes it is generally held that the relationship of landlord and tenant is not necessary to a recovery of the value of the use of real property during its occupation. *Such a recovery may be had from one whose occupancy was unauthorized and adverse*.

Id. at 310 (italics added).  Further, while Belakjon did not involve a claim of trespass, it did note that other states have similar statues.  And, just as the North Dakota Supreme Court found persuasive decisions from other jurisdictions applying their statutes to situations other than when there is a landlord-tenant relationship, the court is likely to find persuasive the decisions of those courts that have applied their statutes in trespass cases, including, particularly, California and Montana.  See, e.g., Christian v. Atlantic Richfield Co., 2015 MT 255, ¶¶ 55-59, 358 P.3d 131 (applying Montana's version of the statute to claims of  unauthorized occupation of real property brought by landowners against the owner of a copper smelter where the  alleged wrongful occupations were the deposition of arsenic and other particulate matter on their lands from smoke emitted by the smelter); Starrh and Starrh Cotton Growers v. Aera Energy LLC, Nos. F058778 & F059660, 2012 WL 210452, at **1-2, 9-11 (Cal. Ct. App. 5th Dist. Jan. 25, 2012) (claim for wrongful occupation of the subsurface of plaintiff's property by contaminated water that penetrated the ground from defendant's unlined ponds and migrated over to plaintiff's property); Cassinos, 18  Cal. Rptr. 2d at 582-83 (discussing that a court may award damages in trespass actions for the wrongful occupation of property based upon

the reasonable value of the use of the property under California statutes that corresponded to N.D.C.C. §§ 32-03-20 & 32-03-21.[24]

Applying § 32-03-21, the court concludes the Raaum Estates is entitled to damages in the same amount as the court determined would be appropriate if it applied principles of restitution, *i.e.*, $40,906. This is because what the court did there was to estimate the value of the use of the SW¼ of Section 15 for the unauthorized handling and disposal of "off-lease" saltwater. See Cassinos, 18 Cal. Rptr. 2d at 582-83.[25]

### The court's damage award

47.     Based on all of the foregoing, the court will award the Raaum Estates damages in the amount of $40,906 on its claim of civil trespass, concluding that the appropriate measure of damages is that provided by N.D.C.C. § 32-03-21. If for any reason, however, § 32-03-21 does not apply and the only alternative of an "at law" remedy is nominal damages, then the court would make the same award applying the principles of restitution.    In addition, regardless of the theory of recovery and in exercise of the discretion afforded by N.D.C.C. § 32-03-05, the court will award prejudgment interest on the foregoing amount at the rate of 6% per annum from and after February 1, 2014.

---

[24] Since that case, California has amended its statute that corresponds to N.D.C.C. § 32-03-21. Most recently, in 1992, it amended it to allow an award based on the benefits obtained by the person wrongfully occupying the property, subject to limited exceptions. According to the legislative history, the reason for doing so was to eliminate any incentive to dump environmental waste that may exist when the only measure of damages is the rental value of the property. See Watson Land Co. v. Shell Oil Co., 130 Cal. App. 4th 69, 78-79 (Cal. Ct. App. 2nd Dist. 2005); West's Ann. Cal. Code § 3334.

[25] There is some suggestion that an aggrieved party may, as an alternative under § 32-03-21, recover the benefit obtained by the wrongful occupier as the "value of the use of the property." See, e.g., Bumann v. Maurer, 203 N.W.2d 434, 438-39 (N.D. 1972). To the extent that may be a possibility, the court rejects such award in this case for the reasons previously expressed for why it would be excessive under the circumstances. N.D.C.C. § 32-03-37 (damages in all cases must be reasonable). Also, the cases which suggested this as an alternative did not involve the unique circumstances present in this case where the benefit derives from the use of two tracts of land only one of which was wrongfully occupied.

48.     Finally, to be clear, what the court is deciding is an amount that should be paid as damages for past trespasses; the court is not determining a rate for future disposal of "off-lease" saltwater, if there is to be any.  In view of the injunctive relief that the court is granting, any future disposal of "off-lease" saltwater through the State Raaum-Fortuna disposal system will have to be by the voluntary agreement of the parties.

**No award of punitive damages**

49.     The Raaum Estates requests that the court impose punitive damages.  Under North Dakota law, punitive damages may only be awarded in cases of "oppression, fraud, or actual malice." N.D.C.C. § 32–03.2–11(1).  For the purposes of punitive damages, the term "oppression" as defined by North Dakota's Pattern Jury Instructions means "subjecting a person to cruel and unjust hardship in conscious disregard of that person's rights."  NDJI C–72.10.[26] "Actual malice" is "an intent with ill will or wrongful motive to harass, annoy, or injure another person." NDJI C–72.16.  And, "fraud" means: "1) the suggestion as fact of that which is not true by one who does not believe it to be true; 2) the assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true; 3) the suppression of a fact by one who is bound to disclose it, or who gives information that is likely to mislead because that fact was not communicated; or 4) a promise made without any intention of performing. NJDJI C–72.12.  As set forth in the in the court's findings, the Raaum Estates has failed to prove that Murex at any point acted with "oppression," "fraud," or "actual malice" as so defined.

---

[26] The North Dakota Pattern Jury Instructions defining "oppression," "fraud," and "actual malice" cite to the relevant North Dakota Supreme Court decisions that stand as the authority for their wording.  The court has reviewed the citing authority and concludes that the definitions employed by the pattern instructions accurately reflect the relevant caselaw.

## ORDER FOR JUDGMENT

Based on the foregoing findings of fact and conclusions of law, it is hereby **ORDERED** and **ADJUDGED** as follows:

1.  Murex is permanently enjoined from using the saltwater unloading equipment, storage tanks, the injection pump and pumphouse, the truck unloading area (together with the property occupied by these facilities) in the SW ¼ of Section 15, Township 162 North, Range 101 West for the disposal of "off-lease" saltwater (*i.e.*, saltwater that has not been generated by production wells or drilling activities on lands subject to the Gulf Lease) absent it obtaining an agreement from the Raaum Estates allowing for the same.

2.  The Raaum Estates shall have judgment against Murex in the amount of $40,906 together with interest thereon at the rate of 6% per annum from and after February 1, 2014 in the amount of $8,405 to the date of entry of judgment, for a total judgment amount of $49,311.

**JUDGMENT SHALL BE ENTERED ACCORDINGLY.**

Dated this 5th day of July, 2017.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court